**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | * | |
| Plaintiff, | * | |
| v. | | Case No.: GJH-15-1339 |
| | * | |
| NORTH STAR FINANCE, LLC, et al., | * | |
| Defendants, | * | |
| and | | |
| GOODWILL FUNDING, INC. and CHAREL WINSTON, | * | |
| Relief Defendants | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

The Securities and Exchange Commission ("SEC") moves for summary judgment against

the remaining Defendants in this civil enforcement action: Michael K. Martin, his company

Capital Source Lending, LLC ("CSL"), Thomas Vetter, and Relief Defendants Charel Winston

and Goodwill Funding, Inc. ("Goodwill").[1]  Martin, who is currently incarcerated, was not

served the Motion for Summary Judgment at the location of his incarceration until January 15,

2019. ECF No. 385. On February 13, the Court granted Martin's first Motion for Extension of

Time to file a response. ECF No. 388. On March 12, he filed a second Motion for Extension of

Time and also sought to Compel Production of Documents. ECF No. 389. On March 29, the

---

[1] Defendants Sharon Salinas and her company Capital Source Funding, LLC were named in the motion, but accepted an offer of judgment on February 6, 2019. *See* ECF Nos. 386, 387.

Motion was granted in part and denied in part, and Martin was given thirty days to file a response. ECF No. 391. To date, neither Martin nor CSL has filed a response.

Defendant Vetter, proceeding *pro se*, filed an Opposition and Cross-motion for Summary Judgment. ECF No. 374. Defendant Winston, also proceeding *pro se*, filed an Opposition to the SEC's Motion for Summary Judgment, purportedly on behalf of herself and Goodwill Funding, Inc. ECF No. 376. However, that Opposition will only be considered as to Winston, as corporations may only file motions when represented by counsel. *See* Loc. R. 101.1(a) (D. Md. 2016) ("Individuals who are parties in civil cases may only represent themselves."). The SEC has also filed an unopposed Motion for Judgment as to Defendants North Star Finance, LLC ("North Star"), Thomas Ellis, and Yasuo Oda. ECF No. 365. No hearing is necessary. Loc. R. 105.6. For the following reasons, Plaintiff's Motion for Summary Judgment, ECF No. 361, is granted in part and denied in part. Defendant Vetter's Motion for Summary Judgment, ECF No. 374, is granted in part and denied in part. Plaintiff's Motion for Judgment, ECF No. 365, is granted.

## I.     BACKGROUND[2]

Defendant Martin is the registered agent of CSL, a limited liability company based in Virginia Beach, VA, with its principal office at Martin's home address. ECF No. 363 ¶¶ 18, 19. Martin has controlled CSL, which promoted transactions involving bank instruments and "monetizing" services since at least 2013. *Id.* ¶¶ 19, 36. From January 2013 to May 2015, Martin, CSL, and two other companies controlled by Martin obtained approximately $4,163,910.28 in deposits from at least 34 investors in connection with bank instrument transactions. *Id.* ¶ 45. In these transactions, Martin and CSL told investors that they could obtain and monetize bank guarantees, standby letters of credit, and other bank instruments. *Id.* ¶ 49.

---

[2] Unless stated otherwise, the background facts are undisputed or viewed in the light most favorable to the non-movant.

Martin pled guilty and was convicted of conspiracy to commit wire fraud in March 2018. *Id*. ¶ 38. As part of this guilty plea, Martin admitted to at least three fraudulent investment schemes from mid-2013 through 2015. *Id*. ¶¶ 38-44. In the first scheme, he admitted to knowingly and willfully conspiring with a third party on a scheme to falsely and fraudulently solicit payments from individuals in exchange for access to blocked bank accounts that would return 1000% on their investments within approximately thirty days. ECF No. 364-10 at 38-39.[3] Martin admitted to knowingly falsifying letters on bank letterhead that purported to confirm the existence of these accounts, and to having obtained funds from the victims of this scheme. *Id*. at 38.

In the second scheme, Martin admitted that he falsely represented to a member of the board of a charter school that, upon the transfer of $400,000, he would obtain and monetize a bank instrument which would result in a payout of no less than €105,000,000. *Id*. at 45-46. Martin admitted that he did not use the $400,000 to monetize a bank instrument and did not pay out any funds to the board member; instead, he used $182,000 of the transferred funds to pay personal living expenses. *Id*. at 46-47.

Martin also admitted to the accuracy of the plea agreement as to the third fraudulent scheme, in which he worked with North Star, Ellis, and Oda after they failed to obtain financing for construction projects for members of the National Association of Home Builders ("NAHB"). ECF No. 364-9 at 6. Martin admitted that he promised the members that in exchange for a "participation fee," he would obtain and monetize a bank guarantee to generate funds that North Star would loan to members for their construction projects. *Id*. For example, one member of NAHB declared that he was told to send $75,000 to an escrow account that Martin would use to

---

3 Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

acquire a bank instrument that would generate $4.8 million in funds. ECF No. 5-43 ¶¶ 15-16.

These funds would then be loaned to the NAHB member on favorable terms to be used for a real

estate project. *Id*. ¶ 16. Six months later, after myriad inquiries by the NAHB member and just as

many false reassurances by Martin and Ellis that the money was forthcoming, Martin agreed to

refund $60,000 of the $75,000. *Id*. ¶ 29. Martin explained that he was keeping the other $15,000

because he was ready to fund the transaction and accused the NAHB member of backing out of

the agreement. *Id*.

The SEC, through expert testimony, has asserted that investments of this kind do not

exist, and no defendant has offered any evidence to the contrary. *See* ECF No. 363 ¶¶ 26-29.

Indeed, despite his continued promises to the victims of his scheme that he could acquire and

monetize bank guarantees, Martin repeatedly admitted at his deposition that he does not fully

understand what a bank guarantee is or how it would or could be monetized. *See* ECF No. 364-2

at 15, 16, 25, 26, 27.

Defendant Vetter was a member of NAHB's Board of Directors. ECF No. 363 ¶ 15. He

began acting as a consultant for North Star in November 2013. ECF Nos. 374 ¶¶ 6-8, 363 ¶ 83.

The consulting agreement stated that Vetter was to be paid "$5,000 per project upon signing of

Term sheet with Company and Builder Client." ECF No. 364-15 at 10. On at least a few

occasions, he was paid one-third of the fees each builder paid to North Star. *See* ECF No. 364-1

at 82-83. Vetter introduced Ellis and North Star to the NAHB builders at its annual meeting in

Las Vegas, Nevada in February 2014. ECF No. 87 ¶¶ 28-30. At this meeting, Ellis pitched

NAHB members on a "100% debt financing" opportunity requiring a "$30,000 refundable

Earnest Money and processing fee deposit." ECF No. 374-9 at 3, 7. Though a disclaimer was

read following the presentation stating that the presentation was "for the builders (sic)

information only," in the two months following the presentation, at least 12 NAHB members applied for the program. ECF No. 87 ¶ 30-31. Vetter helped facilitate these applications, having followed up with attendees who expressed interest with additional details and acting as the "front person" for Ellis with NAHB members. ECF No. 363 ¶¶ 91-92.

Vetter admitted that he was initially "extremely skeptical of this 100 percent financing," and attempted to research Ellis but found little except for a red flag on a website called "Ripoff Report" that he claims he later discovered was an "extortion website." ECF No. 364-1 at 18-19. Vetter claims he was reassured by the fact that North Star was working with Citywide Lending Group, an entity that claimed to be a broker registered with the SEC. *See* ECF No. 374-10 at 6-9. Ellis had also provided him with a newspaper article describing a project that Ellis claimed to have funded. ECF No. 364-1 at 37. Vetter unsuccessfully attempted to follow up with anyone associated with the project to verify Ellis' involvement. *Id*. In February 2014, a builder expressed concern about Ellis' refusal to provide references, and Vetter wrote to Ellis telling him to "[s]ay you are hamstrung because of the attorney's recommendation, and that it is out of your hands." ECF No. 364-1 at 151. At his deposition, Vetter did not recall sending this email and was unable to explain to what attorney recommendation he was referring. *Id*. at 43-44.

Vetter contends that, after funding failed to materialize for any of his builders, he resigned from his consulting agreement with North Star on June 1, 2014. ECF No. 374-10 at 3. But in his deposition he explained, in reference to a June 19, 2014 email that he received naming him as responsible for "educat[ing] the borrower," that he had been "front person" as part of his consulting role. ECF No. 364-1 at 53. Vetter consistently emphasized that his role was not to explain the loan structure, but rather to pass along information on the loan structure created by Ellis. *Id*. Despite his supposed resignation, Vetter continued to send and receive program-related

emails. On July 9, 2014, he proposed to Ellis that "[o]nce we get the first funding . . . lets go over all builders in the closing pipeline and pick the ones we want to continue to do business with and offer them the first slots for new project funding to them." *Id*. at 169. On September 24, 2014, Ellis sent an email to Vetter, Oda, and another North Star employee announcing a new loan program in which the applicants "do not pay back the loan." *Id*. at 176. In this email, Ellis asked Vetter to put the descriptions onto the North Star website, and Vetter did so. *Id*; *id*. at 67-68. Vetter testified that no one attempted to apply for this new program. *Id*. at 176.

Vetter also continued to communicate with NAHB members, passing along updates on the status of their applications. On October 24, 2014, he informed one member that the bank guarantee purchases had been completed, and only a final signature was required to conclude the transactions. ECF No. 364-1 at 194. By November 25, 2014, when the project still had not closed, Vetter emailed the member to say that "It is not as if they are deliberately delaying the process. Mike [Martin] has $3.5 million of his own money in this and I am sure he wants it Reimbursed (sic)." *Id*. at 197. Vetter further explained that he did not get paid until the projects close—a claim he was later unable to explain. *Id*. He sent similar emails to other NAHB members inquiring about the status of their projects. *Id*. at 200-05.

For his part, Vetter also challenges the SEC investigation as based on the suborned testimony of Andy Hutchison, one of the builders who applied for a loan from North Star. *See* ECF No. 374 ¶¶ 9-21. Vetter's allegation of suborned testimony is based on edits made to Hutchison's declaration by an SEC attorney. *See* ECF No. 374-6.

## II.     STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines

that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The burden is on the moving party to demonstrate that there exists no genuine dispute of material fact. *See Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). To defeat the motion, the nonmoving party must submit evidence showing facts sufficient for a fair-minded jury to reasonably return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Additionally, a party must be set forth admissible facts in order for them to be considered in support of or opposition to a motion for summary judgment. *See Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 398, 407 (D. Md. 2015).

Cross-motions for summary judgment require that the Court consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "The Court must deny both motions if it finds a genuine issue of material fact, 'but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment.'" *Wallace v. Paulos*, No. DKC 2008-0251, 2009 WL 3216622, at *4 (D. Md. 2009) (citation omitted).

A district court is obligated to thoroughly analyze an unopposed motion for summary judgment to determine whether the moving party is entitled to summary judgment as a matter of law. *See Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 380 (4th Cir. 2013). "Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the district court must still proceed with the facts it has before it." *Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (internal quotations omitted).

**III. DISCUSSION**

Plaintiff contends that Defendants Martin and CSL violated Section 17(a) of the Securities Act, 15 U.S.C.A. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C.A. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c); and Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

Plaintiff alleges that Defendant Vetter violated Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e). Plaintiff also argues that Defendant Vetter violated Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

Due to these violations, Plaintiff asks the Court both to enjoin Defendants from future violations of the Securities Laws and to disgorge all benefits Defendants have derived from their misconduct. Finally, Plaintiff seeks civil monetary penalties from all Defendants. Plaintiff also asserts that Relief Defendants Winston and Goodwill received unearned payments from Defendant Martin, and that these payments should also be disgorged.

**A. The Definition of a "Security" Under the Securities Acts**

As an initial matter, each of the alleged violations of the Securities Acts requires that the parties have engaged in conduct relating to "securities." The Supreme Court has adopted the "family resemblance" test to determine whether an instrument is a security. *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990). Under this test, a court must presume that "every note is a security." *Id*. However, because "Congress was concerned with regulating the investment market, not with creating a general federal cause of action for fraud," that presumption may be rebutted upon a showing that the note "bears a strong resemblance" to a judicially crafted list of

exceptions.[4] *Id.* at 64-65. To determine whether a note resembles one of the instruments on this list, courts must consider: 1.) the motivations that would prompt a reasonable seller and buyer to enter into the transaction, 2.) whether the plan of distribution of the instrument is one in which there is "common trading for speculation or investment," 3.) the reasonable expectations of the investing public, and 4.) whether the existence of another regulatory scheme reduces the risk of the instrument, rendering application of the Securities Acts unnecessary. *Id.* at 66-67. Furthermore, that a security offered up for sale did not actually exist does not render the Securities Acts inapplicable. *See, e.g., Local 875 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 563-64 (E.D.N.Y. 1998).

In Martin's blocked bank account scheme, he presented and sold purported blocked bank accounts as notes that would pay out 1000% on the investments made by his victims. A reasonable buyer would seek access accounts such as these only for "profit the [account] is expected to generate." *Reves*, 494 U.S. at 66. Martin also sold these notes as though they were being traded for speculation or investment. Therefore, this scheme is properly governed by the Securities Acts. In Martin's charter school scheme, the same analysis applies, except Martin was selling fictitious bank instruments rather than blocked bank accounts.

In Martin's NAHB scheme, the analysis is more complicated, as the bank instruments could resemble a note evidencing a loan by a commercial bank for current operations. *See Arthur Anderson & Co.*, 726 F.2d at 939. Martin induced NAHB members into payments that would supposedly yield funds for the members' construction projects—not personal profit for them.

---

[4] This list of exceptions includes: the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, a note which simply formalizes an open-account debt incurred in the ordinary course of business, and a note evidencing loans by commercial banks for current operations. *Reves*, 494 U.S. at 65 (citing *Exch. Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976) and *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984)).

The NAHB members thus entered into the program for the purpose of "advanc[ing] some other commercial or consumer purpose"—in this case, to finance construction contracts. And it seems clear from the record that the NAHB members did not think of themselves as investors expecting a profit; rather, they considered their payments to be deposits or loan processing fees.

However, the method of generating those funds was still a "bank guarantee," a note that courts have consistently found to be a security. *See SEC. v. Wilde*, No. SACV 11-0315, 2012 WL 6621747, at *4 (C.D. Cal. 2012). The NAHB members also understood that their loans were being funded by the purchase and sale of bank instruments. *See* ECF No. 364-1 at 194 (referring to the buyer of an instrument in Hong Kong). These purported instruments would be traded in ways that reflected investments—indeed, the purchasers of the instruments were consistently referred to as "investors." *See, e.g.,* ECF No. 364-1 at 195. Though these securities did not actually exist, and there can thus be no "reasonable expectations of the investing public," it is also clear that no other regulatory scheme governs the sale of such instruments. Therefore, the NAHB scheme is properly governed by the Securities Act.

B.  Defendants Martin and CSL

Plaintiff alleges that Martin, both individually and as the registered agent of CSL, violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act. Section 10(b), through its promulgated Rule 10b-5, provides that:

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "In a civil enforcement action under § 10(b), the SEC must establish that the defendant '(1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities.'" *SEC v. Pirate Investor, LLC*, 580 F.3d 233, 239 (4th Cir. 2009) (quoting *McConville v. SEC*, 465 F.3d 780, 786 (7th Cir. 2006)).

Section 17(a)(1) bars essentially the same behavior as Section 10(b), but in relation to the *offer* to sell securities, as well as to the sale of securities. *See SEC v. SBM Inv. Certificates, Inc.*, No. DKC 2006-0866, 2007 WL 609888, at *11 (D. Md. 2007). Sections 17(a)(2) and 17(a)(3), on the other hand, prohibit an individual from:

> (2) [obtaining] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (3) [engaging] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

While §§ 10(b) and 17(a)(1) require proof of scienter, §§17(a)(2) and 17(a)(3) require only proof of negligence. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).

Martin has admitted, under oath, to facts sufficient to establish violations of §§10(b) and 17(a)(1), as well as §§17(a)(2) and 17(a)(3). In each of the three above-mentioned schemes, he made false statements as to his ability to obtain and monetize bank instruments that would generate substantial profits. Because each scheme relied on Martin's ability to obtain and monetize these bank instruments, these false statements were material to the transactions. He also admitted that he knowingly and willfully participated in these schemes, satisfying the scienter requirement. And he both successfully offered and sold these securities to his victims.

Because Martin has introduced no evidence sufficient to create a genuine dispute of material fact as to these admissions, summary judgment is granted to the SEC as to the §§ 10(b) and 17(a) claims against Martin.

Furthermore, Martin exercised sole control over CSL, and acted within the scope of his authority in using CSL to enact these various schemes. ECF No. 363 ¶ 19. Martin's violations of the Securities Acts may thus be imputed to CSL, and summary judgment is granted to the SEC as to these claims against CSL as well. *See, e.g., Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority.").

Sections 5(a) and 5(c) of the Securities Act bar the offer or sale of a security in interstate commerce if a registration statement has not been filed as to that security. 15 U.S.C. §§ 77e(a), (c). It is undisputed that no registration statements were filed as to any of the above-mentioned securities. ECF No. 363 ¶ 7.  Therefore, summary judgment is granted to the SEC on the §§ 5(a) and 5(c) claims.

C.  Defendant Vetter

Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), holds liable "any person that knowingly or recklessly provides substantial assistance to another person in violation of [the Act]." *See also* 15 U.S.C. § 77o(b) (establishing the same liability for assisting in the violation of the Securities Act). Though the Fourth Circuit has never discussed the subject, the Second, Ninth, and D.C. Circuits agree that to establish a violation of § 20(e), the SEC must show "(1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter'-

i.e., that she rendered such assistance knowingly or recklessly." *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000) (collecting cases). To evaluate the aiding and abetting claims against Vetter, the NAHB scheme is better understood as two schemes: the initial loans offered by North Star beginning at the NAHB national meeting in February 2014, and the follow-up loans offered by North Star and Martin beginning in July 2014 after the first round of funding failed to materialize. *See* ECF No. 363 ¶ 104.

First, North Star, Ellis, and Oda accepted offers of judgment that established their primary violations of the Exchange Act. *See* ECF Nos. 212, 213, 214. As discussed above, Martin and CSL have also committed primary violations of the Exchange Act.

Second, the SEC has established, and Vetter has not disputed, sufficient facts to hold that Vetter provided substantial assistance to North Star, Ellis, and Oda. It is irrelevant that Vetter claims he was a consultant rather than an employee of North Star. Vetter introduced the North Star Defendants to the NAHB builders. He followed up with attendees of North Star's NAHB presentation and acted as the "front person" for Ellis with these attendees. He was paid for each application he facilitated. Regardless of whether Vetter had "resigned" his consulting position with North Star in June 2014, he continued to update the NAHB members on behalf of North Star and Ellis at least through October 2014, reassuring them that their funding was still on the way. These reassurances were a substantial part of the securities fraud, as they prevented as many members as possible from insisting upon refunds, making the fraud more profitable. *See* ECF No. 364-8 ¶ 26.

Vetter disputes that he offered substantial assistance in the schemes involving Martin, CSL, and the follow-up loans, contending that he was "not involved with Mike Martin from [CSL], nor did [he] have any financial arrangement or consulting agreement with CSL." ECF

No. 374 ¶ 31. But at his deposition, Vetter testified that he agreed, at some point, to pass on updates from Martin to NAHB members. *Id*. ¶ 108. The SEC has also produced at least two emails in which Vetter reassures an NAHB member that "tom and mike (sic) shared some confidential documents with [him] clarifying that . . . only a final signature is required to conclude the transactions," and that "Mike has $3.5 million of his own money in this." *Id*. ¶ 109. Because these emails establish that Vetter's "front man" work extended to at least one member who was involved in Martin's scheme, there can be no genuine dispute that Vetter provided substantial assistance to Martin and CSL as well.

Third, the Court must determine whether Vetter's substantial assistance was provided with the requisite scienter. "In a securities fraud action, 'the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud.'" *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12 (1976)). The scienter requirement under §§ 10(b) and 17(a)(1) can also be met by a showing of recklessness. *Id*. at 344. Behavior is reckless when it is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id*. at 343. The SEC contends that Vetter's behavior establishes recklessness as a matter of law. In his opposition, Vetter counters that he is entitled to summary judgment on the question of recklessness. *See* ECF No. 374 ¶ 29.

It is undisputed that Vetter assisted the North Star Defendants in their first scheme: offering NAHB members loans on favorable terms that required the payment of a deposit. And though these loans were to be funded by the "monetization" of bank guarantees, it is clear that the NAHB builders understood themselves to be applying for a loan requiring a down payment.

Unlike in a prime bank scheme, the NAHB members expected that they would repay the loan. *See* ECF No. 374-9 at 6-12. But the record is devoid of any evidence establishing that Vetter was sold on, or actually understood, the program as the sort of "prime bank" scheme that offered "a combination of huge returns and no risk" that was "inconceivable on its face." Though Defendants cite to numerous cases in which courts have awarded summary judgment to the SEC in prime bank fraud cases on the question of recklessness, in none of these cases was the fraud characterized to the defendant as a more believable program, such as a loan on favorable terms. *See SEC v. Wilde*, No. SACV 11-0315 DOC(AJWx), 2012 WL 6621747, at *6 (C.D. Cal. 2012) (describing a program in which the defendant obtained a $5 million bond and promised a return of $12 million in one week); *SEC v. Asset Recovery & Mgmt. Trust*, No. 2:02-CV-1372-WKW, 2008 WL 4831738, at *2 (M.D. Ala. 2008) (describing program in which clients could invest a "fully secured" principal amount that was "never at risk" and earn between eight and sixteen times their investment in a matter of months).

And though the perpetrators' characterization of the scheme as a builder loan agreement does not immunize it from qualifying as a security under the Securities Acts, this characterization is helpful to understand whether Vetter's behavior was reckless or not. In other words, the promise of a transaction in which huge profits are promised in exchange for a small investment should receive higher scrutiny from a participant than the promise of a large loan in exchange for a relatively small participant fee or down payment.

Certainly, this program should have, and did, raise red flags for Vetter, as the terms of the loan were extremely favorable at the time—although, Vetter asserts, not so extreme that comparable loans do not exist in the current economic climate. *See* ECF No. 364 ¶ 50. Vetter's investigation into North Star could have been far more comprehensive, but it was not

nonexistent. Though Vetter's internet search about Ellis revealed complaints on a site called the "Rip-off Report," he was informed from another media report that that website was, itself, a scam; though he never attempted to contact anyone at Citywide or conduct any research into the firm, Citywide had held itself out as a broker registered with the SEC; though he failed to contact any of Ellis' previous clients or otherwise confirm project funding, Ellis did provide Vetter with a news clip describing an ostensibly completed project. This evidence is insufficient to conclude that Vetter understood, or it was obvious, that the first scheme offered terms that were so facially inconceivable as to support an inference of recklessness. Furthermore, Vetter did make limited efforts—deficient as they may be in retrospect—to verify the legitimacy of the project. Therefore, the uncontroverted facts establish only that Vetter negligently allowed himself to be conned by the North Star Defendants into assisting them in the perpetration of the first scheme.

The evidence of Vetter's recklessness is far more apparent in regards to his aid of the second scheme. In July 2014, funding had failed to materialize for any of the NAHB members' projects for months; Martin and CSL emerged to offer funding in exchange for an additional "participation fee" of as much as $75,000. Vetter admits that "[n]o one, including anyone from North Star, had heard of Mike Martin until July of [2014]." ECF No. 374 ¶ 38. He also admitted to not knowing how Ellis had located Martin as a source of funding. *See* ECF No. 363 ¶ 104. At the single moment when Vetter had every reason to be more vigilant and cautious, there is no evidence Vetter conducted any research whatsoever into Martin. By September 2014, North Star and Martin were offering a new loan program in which the members did not have to pay back the loan—a program even Vetter called "crazy" and bizarre. *Id*. ¶ 106. Still, Vetter agreed to post the program descriptions on North Star's website. Furthermore, for months he continued to represent to NAHB members that Martin's funding would materialize, that Martin was losing money as

16

well, and that neither he nor Martin got paid until the projects closed. *Id*. ¶ 109. None of these statements were true, and Vetter either knew they were untrue, or conducted no research to confirm whether they were true. Under the circumstances—by the time of Vetter's final email that appears in the record, not a single project had been funded in nearly ten months of his work with North Star—Vetter's substantial assistance to Martin and North Star in relation to the second scheme was reckless as a matter of law.

Finally, Vetter devotes much of his opposition to accusations of suborned testimony by SEC attorneys centered around edits made to an affidavit by one of the NAHB members who fell victim to Defendants' fraudulent conduct. Vetter contends, without any citation to authority, that absent this suborned testimony, the SEC would have had no jurisdiction to bring this action. But, as explained above, the SEC has established violations of the Securities Acts that do not rely on the testimony of a single individual. Rather, the SEC relies on Vetter's own deposition and emails, presentations, and other documents to establish liability. Furthermore, none of the allegedly suborned edits to the affidavit establish any material changes that would amount to improper conduct on behalf of the SEC. Therefore, summary judgment is granted Defendant Vetter as to the first scheme, and to the SEC under Section 20(e) of the Exchange Act as to the second scheme.

D.  Defendants Martin and Vetter's Failure to Register as Broker-Dealers

Section 15(a)(1) of the Exchange Act prohibits any person "engaged in the business of effecting transactions in securities for the account of others" from "induc[ing] or attempt[ing] to induce the purchase or sale of any security . . . unless [the person] is registered" with the SEC. 15 U.S.C. §§ 78c(a)(4), 78o(a)(1). Both the Sixth and Eighth Circuits have looked to the following factors to determine whether an individual's conduct requires registration by the SEC: "[1]

regular participation in securities transactions, [2] employment with the issuer of the securities, [3] payment by commission as opposed to salary, [4] history of selling the securities of other issuers, [5] involvement in advice to investors and [6] active recruitment of investors." *SEC v. Collyard*, 861 F.3d 760, 766 (8th Cir. 2017); *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005). Each factor need not be established to assign liability. *Collyard*, 154 F. Supp. 3d at 788-90.

Defendant Martin regularly participated in securities transactions, gave advice to investors, and actively recruited investors. Defendant Vetter was paid by commission rather than salary, and was involved in both advice to the NAHB members and the active recruitment of those members. Therefore, both were required to register with the SEC and, having not, violated § 15(a)(1) of the Exchange Act.

    E.  Relief Defendants

A court may order disgorgement in a securities enforcement action against a relief defendant where that person: "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002) (citations omitted). The SEC contends that Martin transferred approximately $140,000 to Relief Defendants Charel Winston and Goodwill, who provided no services or other consideration in exchange for these funds. As discussed above, these funds were "ill-gotten" gains as a matter of law. Relief Defendants claim, however, that they provided valid, legitimate services in exchange for these funds. In support of this claim, they have submitted documents showing that they contracted to provide "Tear Sheets," bank guarantees, and a "MT799" to "trigger the providing banks to send an 'RWA.'" ECF Nos. 376-2. The SEC's expert witness explains that bank guarantees do not function as investment vehicles, cannot be monetized, and are non-transferrable. *Id.* ¶¶ 38, 39, 40. He similarly establishes that Relief Defendants' use of

these other terms is nonsensical, and thus cannot describe a legitimate transaction between them and Martin. *Id.* ¶¶ 33, 39, 43, 48, 52. Courts have consistently found that these banking processes do not exist as a matter of law. *See SEC v. Milan Group, Inc.*, 962 F. Supp. 2d 182, 195 (D.D.C. 2013) (discussing "misused or nonsensical" terms such as MT 760, MT 799, and RWAs), *vacated in part on other grounds by*, *SEC v. Milan Group, Inc.*, 595 F. App'x 2 (D.C. Cir. 2015); *SEC v. Reynolds*, No. 1:06-CV-1801-RWS, 2010 WL 3943729, *3-4 (N.D. Ga. 2010) (holding that investor transactions involving bank guarantees did not exist). Because Defendants do not offer any evidence to counter this expert testimony that none of these supposed financial products actually exist, they establish no genuine dispute of material fact. Therefore, the SEC is entitled to summary judgment that the funds transferred to the Relief Defendants from Martin must be disgorged.

F. Relief

The SEC seeks injunctive relief, disgorgement, and civil monetary penalties against Defendants Martin, CSL, and Vetter, as well as disgorgement and civil monetary penalties against Defendants North Star, Ellis, and Oda pursuant to the October 3, 2016 entry of judgment against the latter defendants in this case.

Defendants Martin, CSL, and Vetter have committed multiple violations of the Securities Laws, and there is thus a "reasonable likelihood that the wrong will be repeated." *SEC v. Lawbaugh*, 359 F. Supp. 418, 424 (D. Md. 2005). Therefore, permanent injunctive relief is proper. *See Am. Realty Trust*, 586 F.2d 1001, 1007 (granting injunction where three violations were established and proof of negligent conduct was strong).

Because disgorgement is "an equitable remedy designed to prevent unjust enrichment," courts have "broad discretion in determining whether to award disgorgement and in what

amount." *SEC v. Resnick*, 604 F. Supp. 2d 773, 782 (D. Md. 2009). A precise calculation of a defendant's profits due to fraud is often impossible, so a court's disgorgement calculation need only be a reasonable approximation of the gains connected to the fraud. *Id*. Prejudgment interest may be included in the disgorgement amount, "so as to prevent the defendant from profiting" from the illegal conduct. *Id*.

Defendants Martin and CSL jointly collected a total of $4,163,910.28 from investors, $1,474,250.00 of which was returned. Therefore, it is proper to disgorge Martin and CSL, jointly and severally, for the $2,689,660.28 not returned to investors, as well as prejudgment interest of $341,130.54 calculated from the time the last refund was made to an investor on April 21, 2015. *See* ECF No. 363 ¶¶ 110, 114; *see also SEC v. AbsoluteFuture.com*, 393 F.3d 94, 96-7 (2d Cir. 2004) (holding that defendant's liability for disgorgement would be joint and several with the corporation that shared profits from a fraudulent scheme). Vetter received $143,326.03 in connection with the fraudulent scheme.[5] Therefore, Vetter shall be disgorged that amount, as well as prejudgment interest of $19,771.95 calculated from the final payment he received in connection with the scheme on December 10, 2014. *See* ECF No. 363 ¶ 114. Relief Defendants received $140,000.00 of funds for which they provided no lawful goods or services. Therefore, they shall be disgorged that amount, as well as prejudgment interest of $19,313.13 calculated from the final payment made to them by Martin or CSL on December 12, 2014.

North Star received $2,072,255.00 from the scheme, and refunded $10,000 to one investor. Therefore, North Star is liable for $2,062,255.00, as well as $256,904.85 in prejudgment interest calculated from the final payment made by a builder to North Star on May

---

[5] Though Vetter was not found to have acted with the requisite scienter to establish a violation of Section 20(e) of the Exchange Act as to the first scheme, his violation of Section 15(a) of the Exchange Act covers both schemes. Therefore, his profits connected with both schemes were ill-gotten, and he had no legitimate claim to those profits.

5, 2015. The SEC also seeks disgorgement of $924,222.98 from Ellis and $768,233.68 from Oda based on payments made to them from North Star and the requisite prejudgment interest based on these payments. But the total amount of disgorgement should not exceed the amount of profit from the scheme. *See AbsoluteFuture.com*, 393 F.3d at 96. Because the SEC's proposed disgorgement of Ellis and Oda are based on profits North Star made in the scheme—not profits from any other source connected to the scheme—their share of the disgorgement must be joint and several with North Star. Therefore, Ellis and North Star are jointly and severally liable for $924,222.98 of North Star's total liability $2,329,159.85. Oda and North Star are jointly and severally liable for $256,904.85 of North Star's total liability of $2,329,159.85.

Finally, civil monetary penalties "are intended to punish, and label defendants wrongdoers." *Gabelli v. SEC*, 568 U.S. 442, 452 (2013). The Securities Acts impose three possible tiers of penalties, the third and highest tier of which may be imposed only where (1) the violation involves fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (2) the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. 15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2). The SEC seeks third-tier penalties against Martin, CSL, and Vetter. As discussed comprehensively above, the violations in this case involved fraud, deceit, and manipulation, and they resulted in substantial losses for the victims. Therefore, third-tier civil penalties are appropriate.

The Securities Acts provide for calculation of a third-tier penalty in either of two ways. First, a court may impose a fixed amount—at the time of these violations $160,000 for an individual and $775,000 for an entity—multiplied by the number of violations or the number of persons defrauded. *See SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y., 2007);

*SEC v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1, 17 n. 15 (D.D.C. 1998). Second, a court may impose a penalty equal to a defendant's gross pecuniary gain. *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1192-93 (D. Nev. 2009).

The SEC requests a per-violation penalty that would result in a $4.8 million penalty each for Martin, Ellis, and Oda; a $23.25 million penalty for each for CSL and North Star, and a $4.16 million penalty for Vetter. But the gross pecuniary gain calculation—$3,030,790.82 for Martin and CSL, $2,329,159.85 for North Star, $924,222.98 for Ellis, $768.233.68 for Oda, $163,097.98 for Vetter—results in a more just outcome in this case. While Ellis, Oda and Martin all knowingly and intentionally both conceived of and executed several schemes that violated the act, only Ellis and Oda have admitted liability and agreed to injunctive relief before this Court, and thus taken a measure of responsibility for their actions. The SEC has only proven that Vetter's actions, while harmful, were reckless or knowing as to the assistance provided to Martin and North Star by reassuring NAHB members that their funds were still incoming. Because the gross pecuniary gains of each defendant better represents the degree of culpability for their violations of the Acts, the Court will impose these amounts as the appropriate civil penalties.

## IV.    CONCLUSION

Plaintiff's Motion for Summary Judgment, ECF No. 361, is granted in part and denied in part. Defendant's Motion for Summary Judgment, ECF No. 374, is granted in part and denied in part. Plaintiff's Motion for Judgment, ECF No. 365, is granted. A separate Order shall issue.


Dated: <u>August  15, 2019</u>                                        /s/_____
                                                                                        GEORGE J. HAZEL
                                                                                        United States District Judge